Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the audible of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, first case we're going to hear this morning is South Carolina v. United States. Mr. Tenney. Thank you, Your Honor. May it please the Court. The district court in this case ordered the United States to remove a metric ton of plutonium from South Carolina within two years. The Court did not make that determination based on an exercise of equitable discretion, but instead concluded that it was obliged to do so under the Administrative Procedure Act and the substantive statute at issue in this case. In other words, it said shale to shale. Well, it said more than that, Your Honor. In interpreting the Administrative Procedure Act, it said, and as we've explained, this is contrary to how that provision has been interpreted in other contexts. The Court said that in every instance in which an agency misses a statutory deadline, the agency is – the Court is required to issue an injunction to compel performance. As we've explained, that's inconsistent with – in Abbott Labs, the same use of the word shale and the same provision, the Court made very clear that declaratory and injunctive remedies were discretionary and subject to equitable defenses. But, Your Honor, in addition, the Court went beyond that because even if the Court was right, and we submit that it was not right for the reasons we've given, but if the Court was right – if the court – if the Tenth Circuit was right in Forrest-Guardian's in saying that an injunction was required, the District Court in this case went well beyond that by concluding that a two-year injunction was required simply because there had been a two-year gap between the date on which Congress anticipated that the MOX facility would be completed and the date in which it required plutonium to be removed from South Carolina. And there's no basis in – as far as we're aware in any court of appeals for holding that you have to set a deadline that's exactly equal to the amount of time that Congress initially contemplated would be satisfied. To the contrary, even – I think the Court said it was using that, but the Court didn't feel that was mandated. The Court just thought two years was appropriate, but it's Congress that thought two years was appropriate. And I must say, in looking at the materials, it seems to me two years is plenty of time based on the statements the government has made with respect to shipping plutonium. They take, what, six to 12 months to package it, and then you put it on some trucks, nine containers, and ship it out. But you guys have been doing this for years among what's there, seven sites you've been shifting plutonium around. And shipping nine cases of plutonium out in a period of two years, you haven't demonstrated that that aspect of it was arbitrary, have you? Well, two responses to that. First, to the first part of your question about what the District Court said, the District Court did not state in the relief order that set the two-year period, did not state that it thought this was an appropriate amount of time in light of the evidence before the Court did not – No, it didn't. It basically thought that since Congress had made that judgment originally, it's good enough for me, and I'm going to make that judgment. That's basically what the Court said. Right, and respectfully, both on the facts of this case and in general, that's not an appropriate way to exercise – Why is it inappropriate? Why don't you – she has issued the injunction. It's abuse of discretion. Yeah. And why don't you tell us why two years is arbitrary? Sure, Your Honor. I mean, the problem, as was explained in the District Court, is that you need to have an appropriate place to ship the plutonium to and figure out what you're going to do with it when you get there. And at the time of the District Court's decision, the Department of Energy had not identified another facility that was appropriate to – There are seven sites in the country, and much of the plutonium in South Carolina had been shipped from other sites. And the question is, this stuff has been shipped back and forth. Some of it came from Washington. Is that – Your Honor, I don't recall exactly where it came from. There have been changes over time. Well, sure, there have been. But there are places that this can be shipped back to. And as a matter of fact, the current NEPA proposal says it's going back to some other sites. What, Colorado, Texas, or something? Subsequent to the District Court's decision, it was determined that a fraction of the plutonium that's out of South Carolina, close to one metric ton, but not substantially more than that, could be repurposed and not considered to be surplus plutonium anymore. And – Let's forget the repurposing. I'm talking about plainly shipping a ton of plutonium out, putting it in the containers, which I understand is the longest part of the process, six to 12 months, to package it. They have these special containers. They put it on trucks. They have to put it in nine containers, right? Your Honor, I don't recall the exact number of containers. I know it's come down from what the original estimate was. But I guess the point here is that – Well, why don't you know? I mean, I don't know more than you do about this record, do I? Your Honor, we're not disagreeing that events subsequent to the District Court's decision have demonstrated that it is possible to move this plutonium – one ton of plutonium. Well, Your Honor, the record in this case suggests that this can be done in two different shipments, one to Nevada and one to Texas, just as you've described. But I want to explain why it is that ordering the United States to do this was not an appropriate exercise of discretion. At an absolute minimum, the District Court should have expressly considered the reasons that this might be problematic. Well, let's start with the original deal. South Carolina really wanted all this stuff in South Carolina. They had plutonium shipped there. They had the plant built. It created jobs. It was good for the economy. The Congress passed an act creating that at the behest of South Carolina. And there is a clause that says if the plant isn't built, then South Carolina doesn't want plutonium. And there's this statutory provision. That issue here is that they have to then ship out one ton – what is it, every year, two years? Your Honor, the statute says that they have to ship out one ton by 2016 and then all plutonium that's been shipped to South Carolina in a certain period by 2022. And you didn't ship the one ton by 2016. That's correct, Your Honor. We're not disputing that. And the question is, what do we do now? And I just want to explain what it is about the plan that, under duress of this injunction we've come up with, that's problematic. I know, but the problem – I'm going to let you explain it fully. It doesn't sound like it with all my questions, but your brief kept harping on the fact that you have to process this stuff in South Carolina and oxidize it and create it into some other deal, and that takes a long time. And you made a very good case of that. But the question in this case is not whether you have to process plutonium in South Carolina. It's whether you just ship it in its present form to some other place. And that was done to get it there, and it can be done to get it out of there. And your proposal in the NEPA is identical to that. It says in the NEPA's proposal, it says we're going to – and you used all your prior proposals on this – we're going to package it in nine or ten containers, whatever it is, put it on trucks, and ship it. And you talked about the exhaust created by the trucks and how many days the trucks are on the road and this type of thing. And it looked to me like the most time-intensive part of it was packaging the plutonium in those special containers that met Department of Energy requirements. Thank you, Your Honor. There are two aspects of this that complicate it that I'd like to lay out. One is it's not just a matter of packaging. It's figuring out where it's going. And there are different types of plutonium. There's actually a variety of forms that plutonium can be in. And different sites are certified to receive and to store for different lengths of time different types of plutonium. And we – what happened – Are you saying it's impossible, you don't have any place you can put the plutonium? Your Honor, at the time of the district court – the record before the district court at the time of the injunction, the Gunter Declaration suggested that there wasn't another site that was suitable for storage of the plutonium that was in South Carolina. The reason that there's been a change is that subsequent to that, there was a determination in conjunction with the people who used plutonium for defense purposes that a limited portion of the plutonium in South Carolina – Close to about one ton. Yes, could be repurposed for programmatic purposes and then could be sent to another facility for what's called staging, where that facility wouldn't be able itself to process the plutonium. So it will then subsequently have to be transported to either back to South Carolina itself or to another facility, most likely in New Mexico, in order to be actually disposed of. Now, we had not identified a facility that had the right certification for indefinite storage of this material. And so in identifying such a facility, and in some cases that would require constructing a new facility or taking other actions that would take actually a significant period of time beyond the – You have seven facilities around the country, right? And as of 2016, is there any place you could have shipped one ton of plutonium, especially since the plutonium that's in South Carolina, what, a third of it or something came from those plants? Well, I mean, some of the places that it came from aren't operating anymore, and some of the things changed, and what the record – Which ones? Which ones? I didn't hear all this stuff mentioned in your briefs or in the record. Your Honor, what the record suggests is, in the Gunter Declaration, it stated that there was not at the present time another facility that was in a position to receive this plutonium in storage. Let me ask, are you representing that no other facility had room for one ton of plutonium at that time? Well, it's not just a question of one ton of this particular plutonium, but that was – This particular plutonium. That was what was in the Gunter Declaration, and subsequent to the declaration – Answer my question. Are you saying that as of the time the court considered this, there was no place to which one ton of plutonium could have been shipped? None of the seven places. The government had not identified a facility. I didn't ask about identified. I said, is it as a matter of fact? Well, Your Honor, the reason that's a tough question to answer, and I apologize that it seems like I'm not answering you directly, I just want to be very clear. The question is whether – this is obviously a highly dangerous material, and it comes in many forms, and there are many different – The generalities, we understand this. Right. But the problem is you've shipped plutonium around the country regularly, from the Hannity plant to South Carolina. South Carolina was going to process this stuff. It was going to create jobs and so forth. It doesn't sound like all the impossibilities that – you have these seven plants, and if you told me the seven plants could not take one ton of plutonium that had been shipped to South Carolina, then you might have a point. But you haven't made that point. You talk in generalities about plutonium's dangers and the different kinds, and we have to find the right place. Well, let me tell you what was said, Your Honor, which I think maybe – I'm not sure if it's exactly responsive to your question, and I apologize for that, but let me just be precise about what was said. They did not have a facility that was certified and ready to receive a metric ton of plutonium from South Carolina at the time of the district court's decision. But you can't – even if it doesn't take that long to ship it or to repackage it, there is a certification process. You have to determine whether the conditions in the facility are appropriate for that type of plutonium and at that time and for the right amount. And they had not identified such a facility despite significant efforts to do so. So that's the – and that is in the bunker declaration. So was all the plutonium in South Carolina of a particular type or were there different types? No, there were different types. Well, why don't you ship one ton of type that you can move? Well, so what happened subsequent to the district court's order in this case, Your Honor, is that they figured out that there was an amount of plutonium close to a metric ton that they could repurpose for defense purposes, and then they could stage it in Nevada for a period of time, which does not require as much background effort as moving it to some other place for permanent storage. That there was close to one ton. But who said it had to be moved for permanent storage? The statute basically says just get a ton out of South Carolina. But you can – if you can put it someplace temporarily, you can solve that problem there. You can repurpose it. You can oxidize it as a MOXET or whatever, or you can do whatever you can do with plutonium or find a site where you can store it permanently. Well, Your Honor, the department – I guess it's two points. One, the department is not – and should not be ordered to move plutonium to a place where it is unclear that it will be able to be stored safely for a sufficient amount of time. Was Congress out of bounds when it said you had to get a ton out of there by 2016? Your Honor, the statute was enacted with a lot of expectations. It was enacted years ago about expectations about what was going to be able to be done. And there are lots of cases with statutory – Do you argue that the one – I mean, you can make these arguments in the abstract. Are you arguing you could not as of 2016 send out a ton of plutonium? Well, Your Honor, it turned out that almost exactly one ton – Just answer my question. Was it impossible for you guys to ship out one ton of plutonium in 2016? Well, Your Honor, we now know that it wasn't based on the work that was done subsequently. It was not impossible. Well, we hadn't identified a way to do it. That's what you just said. It's not impossible. As a matter of fact, Judge Giles left open to you the right to come back and say it's impossible to comply with what you want us to do. Your Honor – Is that not true? What she said was – she said, I don't have to make a determination about whether it's possible. See, I'm over my time. Go ahead. She said, I don't have to make a determination right now about whether it's possible or not. If you think it's impossible, you can come back to me later. That's pretty much just what I asked you. She didn't say that. That's exactly what she said, Your Honor, but that is not an appropriate way to issue an injunction to say, well, we're going to figure out later whether it's possible. And, you know, we've identified no other court that's taken that approach. You gave your report here recently, I think, and you submitted to us rather than it happened since, and you're saying you're making good progress or something. Yes, Your Honor, that's what happened. You have an assorted impossibility. Your Honor, I apologize – Absorb her. I apologize for going over my time, but I would like – Answer his question. Yeah, I would like to address that specifically, and this goes back to the point that I was trying to make earlier. What they've identified as a way, which at the time of the judge's order, you know, had not been nailed down as a way that this could work, but they've worked really hard in response to the court's order and come up with a way to do this. And let me tell you the drawbacks of that way to do it and explain why at an absolute minimum a district court should consider those drawbacks and determine whether it is in the public interest to order an injunction of this kind, a consideration – You're not the district court. You could go on back to her and ask her to modify it if you had some possibility defense or something. Well, let me explain the defense – Instead of that, you come up here on appeal, and you're putting stuff in the record that she's never considered. You're wanting us to take into account something that she's never seen and reverse her. Your Honor, I respectfully submit that's not what we're trying to do. What we're saying is based on the record before her at the time, and I refer specifically to the Gunther Declaration, paragraphs 31, 32, and 34, which is on pages 856 and 857 of the Joint Appendix, what Mr. Gunther identified was that if – at the time what he was saying is even if we could identify a facility to ship this to temporarily, what we would be doing is exposing unnecessarily our workers to radiation because what happens is every time you manipulate this plutonium, every time you take it out of where it is stored, every time you repackage it, every time you transport it, every time you take it out of those – out of the containers it's transported in and put it somewhere else for storage – Isn't that argument foreclosed by the statute? The statute basically said if you don't complete the MOX plant, you have to ship out one ton. That's what Congress' determination was, and they're telling the agency to do that. Now, so that was a risk. Moving plutonium is risky all the time. Wherever you go, there are risks everywhere, and you identify them. But you have these containers that are pretty high-tech containers, and you have people working with these suits that are generally pretty protective, but Congress took that risk into account, and Congress said if you don't complete the plant, ship out one ton by 2016. That was pretty clearly the policy of the United States. And now the question is the agency hasn't complied, and the district court says we'll comply within the two years that Congress set up. And you're saying, oh, that's impossible. Well, don't you – shouldn't you tell Congress? Your Honor, in any case in which an agency has missed the statutory deadline, then the – It's not missed. The question – you said it's impossible to do it within two years. And I'm saying that was the original requirement, and nothing's changed. Well, a lot of things have changed, Your Honor, but – And the judge said if you want to assert it's impossible, come back and see me. Yes, but again, we're not aware of any – If you didn't want to see her, you came to Richland. Yeah, but we're not aware of any circumstance in which another court has said, I don't need to decide whether it's actually possible to comply with my injunction. Just come back if you think it's impossible in the context of contempt proceedings. Well, that might be a good argument, except that there's two things that cut against it. One is the two-year period is not totally arbitrary. The two-year period was a judgment made by Congress after hearing from everybody, including South Carolina, who initiated the statute. That's number one. And then number two, you have produced evidence that says you're likely to comply with the two years based on your efforts since the order. And then, of course, number three, as Judge King has noted, if it turns out that what you plan to do doesn't work, you can go back to the district judge and say we need another six months or we need another year because of this problem or that problem. And I'm sure the court will exercise its discretion in the view of the circumstances based on the case you make. But to say no court has done this, I mean, every injunction is unique to its circumstances, isn't it? Well, let me take, if I put your considerations in order, your first consideration was that the two-year period was set by Congress. And the question is whether, admittedly, the agency has missed the statutory deadline that was set by Congress. But the question is whether then you just figure out the amount of time that Congress gave you and then tack that on at the end and say that's the injunction. It's not just. It was a measured time. And the question is you're saying the measured time that Congress gave you is impossible. Well, let me give you an example from the D.C. Circuit in the United Mine Workers case that we cited in our brief. The statute said that the agency was within 90 days of the completion of a hearing to issue a final rule. That was the statute. And then eight years went by after the completion of the final rule, from 1991 to 1999, eight years. And then somebody came into court and said, you're too late. And the court did not say, okay, well, Congress said 90 days, so we're going to say 90 days. Well, Congress said, what the D.C. Circuit said was please submit a plan to us. And the plan that was set up took several more years. And then the D.C. Circuit said, and we're not even going to order you to comply with that plan. What we're going to do is retain jurisdiction. We're going to have periodic status reports at the dates that you identified in your plan, and then they can come back to us if they think things are too slow. Is that analogous? It seems to me the analogy would be that the agency couldn't comply to build the plant, and they haven't, of course, or they couldn't comply by 2016 because the plant was being delayed. But the interval that Congress created, the two-year interval, is just being transposed as a starting point for the district court. And the district court theoretically has jurisdiction. It issued an ongoing injunction. You can go back any time to modify it or revoke it. I think your best question arguments are whether the court understood the scope of its discretion, what was mandatory, and what was discretionary. And that's a very tricky point in this case because you have the statute, which mandates. You have the APA that says if it's unlawful, you have to issue, you shall issue. Then you have the normal discretion attaching to any injunction, which is discretion. And I don't know what you advocate. The judge felt pretty much compelled in one sense and maybe didn't recognize how much discretion she had. That's probably your argument, I gather. That's exactly right, Your Honor, and that's, in fact, where I began, which is that, look, we can have an argument about whether, as an exercise of equitable discretion in light of all of the facts, it would be appropriate to issue a two-year deadline. And as Judge King pointed out, some of that- My question is, are you objecting to the entry of an injunction at all, or are you objecting to the two-year period, or both? Well, both. What's your objection to the entry of an injunction at all? Well, I mean, when you say an injunction at all, it has to be a mandatory injunction telling you you have to get a timeout. I mean, we don't think that since the agency was working to do that anyway, what courts have typically done in these circumstances is to retain jurisdiction, have the agency make a plan and monitor- That can be done. That could have been done. The question is whether this district court exercised, abused its discretion in issuing an injunction. And my question is, is an injunction out of order altogether? Well, Your Honor, the question of whether the district court abused its discretion, if the district court made an error of law and we submit that the district court did because the district court thought it was compelled to issue this injunction without exercising its discretion, then that is by definition an abuse of discretion. And so we would submit that- Is that for the entry of the injunction or for the time period? Both, because the district court thought that it was compelled to do both of those things. I thought the court made a judgment call about the time period and said, because Congress put in two years, I think that's appropriate. But if it doesn't turn out to be that, you can come back. Well, we submit, even if you interpret it that way, we submit that it's an abuse of discretion not to even consider the difficulties involved in this. And I would like to circle back because you had raised several points about the difficulties, and I want to just make sure I get back to them. The second issue was, oh, well, now it turns out that we can do it. And I just want to explain the differences between what we're doing now and the disposal option. And the district court made quite clear in an earlier order. You see, you keep raising that, which you did in the brief. Disposal is not the issue. The only issue is removal, shipping it out of the state in its present form. There is no transformative requirement, preparing it for this or preparing it for that. And your brief kept going into the- I think you made a good case for the notion that it takes a long time to reprocess this stuff. But her argument was, her order was just ship out in its present form. It came in in its present form, and it can be shipped out in its present form. Well, so that's the question, Your Honor, and I guess the district court recognized in an earlier order that it was not proper for a court to tell the Department of Energy how to move the plutonium out of- She didn't. She just said, oh, just follow the statute. But ship it out. You don't need to- Let me ask you, as a matter of fact, isn't about a third of the plutonium there plutonium that was shipped into South Carolina from other sites in the United States? Your Honor, that might be right. I don't know the exact figure, but certainly a significant number was shipped in, yes. And they were shipped from the various plants, nuclear plants in the United States. Set aside the foreign stuff. Right. And so they were shipped in a form in a case that they had used and gotten NEPA approval for, and they're relying on that same NEPA approval with supplemental facts to ship it out. Right. So there's two issues, Your Honor, one of which identified earlier, which is you need to have a facility that right at this moment is properly equipped to receive the plutonium. I mentioned that earlier. Then the second issue is there's a decision to be made here, and it relates to- Look, instead of telling me the problems, tell me that you didn't have a site. If you say you didn't have a site that could receive it, that's one point. But of course you have to have a site to receive it. You have to have an ability to drive a truck. You have to have a truck driver. The question is, did you have a truck driver? Did you have trucks? Did you have containers? And did you have a site where you could store it, even temporarily? Your Honor, I'd like to get this exactly right because I don't want to mischaracterize what was said. So I'm going to the Gunter Declaration, and if you'll indulge me just for a minute, I want to find- I'm on page 854 of the Joint Appendix, and I'm reading from paragraph 25 of the Gunter Declaration. I think this is responsive to your question, but I don't want to mischaracterize it. In order to transfer one metric ton to a facility other than WIP, WIP is where the down-blended plutonium would go, DOE would need to identify a facility with the necessary capacity, security, and safety basis envelope to receive and store one metric ton of defense plutonium. It would take months to complete the analysis and determine whether facility safety upgrades would be required to receive and store this material at another location. Constructing facility modifications or building a brand-new facility would cost tens of millions of dollars and take years to complete. Isn't that just hypothetical? In other words, we have seven facilities. The plutonium came from those facilities, and the question is, okay, it takes months to determine it. Do those months, and then package it and set it there. I mean, you have quite a few to consider, but you keep telling about the possibilities and what could be involved, and I know it's complex. The question is, you have to come back and say, we don't have a facility. Well, I don't have room, and the issue, if you have to build a new facility, you've got a really good case. Well, let me continue from the Gunter Declaration then. I'm on page 855 of the Joint Appendix, paragraph 27. Let me ask you a question regarding where you're going with this. It seems to me that what you're reading, even if we accept it, it wasn't something you found out in 2016. You knew this was coming the whole time. You had to anticipate this. And part of what the trial court was facing when facing this situation is, are you really serious about following what you've been told to do? The fact about it is nobody wants this plutonium grade uranium here, whatever, plutonium. Nobody wants it. And now you're stuck with a situation of what to do with it. And when the trial judge here faced what is here, as Judge Niemeyer has been alluding to, the real question comes down to is, did you establish every element to show it is impossible? If you could have done that, probably the judge could have avoided the backstop of saying impossibility. But you didn't say it was impossible. You said it might be, and et cetera. So it left open that door. But even now that you're here now, the world is not lost to you. The judge says, come back, and if you can establish to us that it's impossible, you don't have to do it. But you want that declaration right now, and you want the court to say, Shell is not Shell in here, that, oh, you've got some equitable type situation. It doesn't come across too well. And there seems to be no indication of a desire to even move this stuff at all. Because if you can just delay and delay and delay, then why would Congress even have it in at the beginning? The point being is, you've known this for a long time. All those months you're talking about, you've known it. This thing has been going on 20-some odd years. And you knew what it was when it was there. You knew it was dangerous to move. And all this was done when that agreement was made. So why are we here now? Why don't we just let this be, and then you come back and let us know if it's impossible. Let the trial judge know that it is. I guess two responses to portions of that question. One in terms of whether the agency knew that this was coming. The agency has been working on this. They did an environmental impact statement about the dilute and dispose option, and they did a record of the statement. The agency has been working on knowing that in 2016 it would have to remove one metric ton. When did it start working on that? I mean, it's been working on removing plutonium. When did it start working? You said months. You told me it would take months to do this stuff. So when did you start? In 2015, they issued a 1,000-page environmental impact statement. When did you know that in 2016 you would have to move a metric ton if it had not been in compliance? When did you know that? I mean, the statute's been in place. When did you know that? What year? I'm trying to remember when the last statutory amendment was. I'm not disputing that it's been several years, Your Honor. Several years? So for several years, you know 2016 is coming. What do you do? Do you just wait until it gets here and say, hey, we can't do it? Well, no, Your Honor. What they're trying to do is to figure out that this is what we're talking about here. Most of the other agency delay cases are about putting out a rule or making a designation. This is not a delay. The delay is the construction. And your comeback to Judge Wynn's question was set forth in your brief. We were engaged in dilute and dispose, which is an involved process. But the statute doesn't say that. The statute says basically you can have that course, you can pursue that course. But the statute says if you don't build a MOX facility, you have to remove one ton of plutonium. Not dispose and dilute it. To remove it physically from the state of South Carolina. That was part of the deal. And it turns out that if you address that part, it looks to me, based on my review, and I read quite a few of these NEPA things and the facts relating to it, it looks to me like that's not even a difficult thing. You just identify the plant that you're going to ship it to, pack it up. But they say that's going to take six months and drive the truck, which will take a few weeks. I mean, what the Gunter Declaration says is that it would take six to 18 months, depending on the complexity of the analysis, to complete the safety analysis to support the transfer of the one metric ton. That's been proved false already because we have a document you filed where it has the whole proposal laid out with the statement and looks like we can comply. Yes, because what happened was subsequent to the declaration and subsequent to the district court's order, they identified another pathway. But I want to go back to the question, which is there's no dispute that the Department of Energy is trying to get this out of South Carolina. Now, South Carolina is dissatisfied with the pace of it. I'm not sure about that. In other words, my view, and I can tell you this is the crux of my problem with this record entirely, is you're carrying on the policy of the agency, which is to engage in dilute and dispose of the plutonium. That's a good policy, and that may be a way to address a lot of the problems we have in stored plutonium. But the original deal was build a MOX plant, and if you don't build a MOX plant, remove one ton of plutonium. Not dilute and dispose of it, remove it. Because that was shipped there initially for that purpose, and the deal cut between the state and Congress was to get one ton out. Now, everything you say is, oh, the impossibilities now of doing that or the improbabilities or the difficulties. Well, maybe they are. But those were presented to Congress at that time, weren't they? Or were they? I mean, the specific difficulties we're encountering now were not because they couldn't have been known at the time. I mean, things change. But every time there's a statutory deadline. This is not a statutory deadline. This is not like building the plant with impossibility. This was a backdrop remedy for failing to meet the remedy, which is to get the plutonium back out because it was shipped in. And I don't understand why you're resisting so much the notion that shipping plutonium out is any more complex than shipping it in. Well, I mean, the point about the facility is critical where it's going to. Sure it is, but tell me it can't be done, and then we'll talk. I mean, you just keep saying we have problems, we have to identify. Well, what's that mean, we have to identify? There are seven plants in the country. It's the only places we can go. So you call up or you figure out whether you can store those seven plants. Well, I guess let me frame this in terms of the district court exercising which, again, we submit was not done here and should have been, and that's a reversible error in itself. Now, the district court did not say, oh, how do I want the Department of Energy to be spending its time? Do I want the Department of Energy to be trying to find another facility, to be doing a safety analysis? Maybe it turns out at the end of the safety analysis that it's not feasible to send it to that other facility, and then that time has gone down the drain. Or even if you identify another facility, you need to make a determination. Okay, I'm going to ship this plutonium with all of the health consequences attendant to that that we know of. Why are you putting that burden on the district court? It seemed to me the statute didn't put that burden on the court. The statute said get it out, and the court says get it out. Now, you have to come back and say it's inequitable to issue that injunction because A, B, and C. You said we can't dilute and dispose. That was your whole message because it's so complex, it takes time, and your points were well taken. And then you say, well, you have to identify a site. Well, sure, you have to do a lot of tasks. The truck driver has to climb into the seat and drive too. I mean, there are a lot of things you're going to have to do, but it seems to me it's your burden not to lay forth the problems, but to say that you can't do it. Well, I mean, the case is complicated by the fact that there have been developments since the district court issued the order, and so at the time that the district court was deciding, I take your Honor's point that we have to make our case for why the district court in the exercise of discretion should not issue an order of this kind. I take your point, and we did. We made a submission. I would urge the court to look at it. It's quite detailed. It does not just say there's a lot of things we have to do. It talks about the problems associated with it, the uncertainties, and the health consequences for employees that are unnecessary. Now, the district court took that. Don't you think that's immaterial? I mean, the same risk was attended shipments in. Your Honor, I don't think it's immaterial, and here's why. It has to be done. There's no question about it, but that risk is inherent in the statute. Well, it actually said ship it out, and everybody understood plutonium can't just be put on a pickup truck and shipped out. Well, here's the difference, Your Honor, and I think it's critical. If you're shipping it to a place where they're going to dispose of it or they're going to store it, and so you're actually accomplishing something, you're moving it to a place that actually takes you a step closer to what the risk is, which is to deal with our surplus plutonium in the United States. And so you can make a judgment that it is worth, I mean, I think everybody agrees, it is worth when these people are doing dilute and dispose, of course they're exposed to radiation, but it's worth it because they're accomplishing something, they're getting somewhere. That's a policy argument. We can't handle that. When Congress says to move it and not dilute and dispose of it, and you say it's better to dilute and dispose of it, and every time you move it there's risk, well, sure there's risk. Every action you take has risk. Your Honor. But that's inherent in the statute, isn't it? Your Honor, I submit that when you're exercising equitable discretion, yes, you can consider arguments of that kind. Well, okay. And the district court didn't. Why don't we hear from the other side? We've gone a little beyond here. And I appreciate the court giving me extra time. Okay. Mr. Weddington. May it please the Court. This case has come a long way just from the time in the middle of March of this year when the brief of the appellant was written. Events have kind of outrun their briefing and their arguments, and it's to their credit that events have outrun it because the reason events have outrun their briefing is because they did what they were supposed to do. They've gotten a good start on it. In fact, as far as the NEPA compliance is concerned, they've done better than do a good start on it. They've done it. They've complied with NEPA already. So to sort of merge what I've heard from all three panel members, it seems like the only thing the Court should do at this point is simply affirm the district court, wait and see if it comes down the pipe a bit later on. Let me ask you something, Mr. Weddington. You know, we've pressed the government on what it's done, and, of course, Mr. Tenney doesn't control the whole Department of Energy, and these are complex problems, and there's a lot of risk intended to all, and there's different policy solutions being run at the same time. Maybe the MOX plant will be built. Maybe dispose will be the best way. Maybe some plants will be closed. I mean, these are really big policy issues, and we're on a narrower point. Sure. The question I have, though, is the district court seemed to feel compelled to issue the injunction and maybe didn't recognize the discretion that she maybe had, and I'm wondering if you could address that. The government has raised that, and it's a complex issue because the statute is mandatory. The APA says if an agency is unlawful, then relief shall be given, but then in the end it's still an injunction under Rule 65, which has discretion, and I think the APA also retains aspects of equitable discretion within it. So this is an interesting blend, and the question is, did the district court err as a matter of law in adopting a role that she felt compelled to issue the injunction as opposed to exercising discretion? I'm happy to answer that question. I think there are two parts of it, really. The first part is whether the district court is compelled to issue an injunction as opposed to denying an injunction. In other words, the statute, the moth statute, the plutonium statute, says shall move a ton by that date, 2016. The APA 706, of course, says the court shall compel agency action, withheld agency action. Let me ask you, what if a foreign nation 10 days before the court held court was landing submarines on the East Coast in the South Carolina area, and there was an engagement there and a lot of direction of attention, there was an effort probably to steal plutonium or whatever, and this was brought to the attention of the district court, would the district court have discretion to deny the injunction? That's sort of a... It's far out. It questions your point. Not so much for whether it's far out or not. I would take the technical point that at some point the district court would need to issue an injunction, but maybe not right then because of the situation in which it found itself. Well, then it would deny the injunction temporarily or it could retain, as the government argues, it could retain jurisdiction. But my point is there seems to me the whole reason we go to a court is as the court make a judgment call. And the question is how much discretion did the court have? And the district court may have cabined its view of its authority too much such that it did something that in its discretion it might not have done. Now, that I would disagree with. I think the district court held, and cited from law for it, that when you have two shells like this, shell in the APA and shell in the statute that its discretion is cabined, that it doesn't really have that much discretion, if it has any discretion at all, to deny relief. There's plenty of language in cases that says that, not the least of which is the Forest Guardian case from the 10th Circuit. Got to do something. Got to issue some kind of injunction sometime. Now, did the district court in fact exercise that? Well, why do you say that? Don't you think the word shell has been recognized to be a loosey-goosey term? It's not always mandating. It aims that direction. The Supreme Court has recognized that repeatedly. Well, I think Judge Wilkinson said one time that, a child who learns that the word may is wonderfully permissive, where a shell is a good deal sterner. Well, that's probably true. But, okay, so the district court, let's say the district court decided it had limited discretion to deny an injunction. Let's make the hypothetical a little different. Let's say the district court erred in restricting its discretion to the extent it did. What should we do in that case? I think you could find, based on this record, that the district court did exercise some discretion, exercised quite a bit of discretion, and that it should be affirmed based on the points that are made in the district court, which I would like to make very quickly. In the course of exercise of discretion, again, assuming it said, I've got to do something. I can't just deny relief. We've got two shells here, and I can't just simply deny relief. I've got to do something. The first thing it did was it didn't make its original word, the 37 page word, the last word on the subject. It said, party, come back to me and tell me what the practicalities are. Let me see what I can do here. And then when it did issue the injunction, of course, it provided that it would not tell the Department of Energy how to do the removal of plutonium. It just said remove it, which is exactly the way. I would submit to you this is a model, actually, order, a model injunction, because it did just what the case is saying. Don't tell them how to do it. Just tell them to do it by a deadline. It took into account the fact that defund compliance was required. It took into account that the statute said any removal had to comply with all other applicable laws, and the state was originally arguing that the plutonium should be removed immediately. This argument was being made in 2017. And the district court said, no, I'm not going to require that it be removed immediately, even though we're a year or two past the deadline. So discretion was exercised on all four or five of those points. And the court did hear from the parties. And, of course, ultimately the court said, okay, Congress said two years. Two years seems to be the right amount, especially since Congress repeated that on three or four separate occasions. And then when you take it all into account, on top of that, ordered the plutonium removed by January 1, 2020, which in effect was a four-year extension, because it took two years without undue delay for the district court to get to that point and issue that order. So she gave them a four-year extension of a deadline that had already been extended any number of times. It was supposed to be removed by 2011, and I think it was actually the judge's deadline was 2020. So I would just argue that, yes, maybe she had limited discretion to deny an injunction, but also, yes, having decided that she had to issue an injunction, she exercised a fair amount of discretion in deciding what the time period would be, heard from the parties, didn't tell the agency how to do it, and didn't ask the agency to do the impossible. Now, of course, as I say, the two impossible, the DOE's two impossibility arguments are, A, we just can't do it, period, and, B, we can't comply with NEPA. And their filing and our filing, 28J filing last week, indicates that both of those are not true anymore. 28, they can comply with NEPA, they have complied with NEPA, it's over. The NEPA, in this case, it's over. And they say there's a pretty good chance we can get it done within the two years. And the next report is due in, I think, the middle of December. I don't know if the court wants to wait that long to rule, but that could inform where this case goes from here. And as Judge King has said in particular, you know, there's a provision in the order that says, let's say they try really, really hard, and apparently they really are trying hard, and I can't credit them enough for making the effort at this point. They try really, really hard, and they get to the point, and it's 18 months down the road from the district court's injunction order, then they can come back, to quote Judge Charles, in a proceeding to extend the deadline to say, look, we've really tried hard now. We've had a whole year and a half, and we can't do it. I'm glad to hear your recognition that the agency is working hard. It looks to me like their efforts on the NEPA was a serious response to the court. And not only that, my pointed questioning of the government is not intended to demean the reality that we're dealing with a serious problem of safety and policy and environment, and it has to be done right, and I'm sure they are not compromising their standards, in that regard. Right. I mean, this is obviously, there were other policy considerations for these statutes. I can remember back when South Carolina was soliciting the business and got the Savannah River Project. I think they even receiving plutonium from other countries, Russia, and all of that. So these are big, overarching policy concerns and deals that have been reached to try to handle a serious problem internationally and nationally, and so I'm not demeaning that in any way. I think the focus in this case is really a fairly narrow one, is that there was a kick-out remedy of removing one ton if certain conditions hadn't been met, and everybody agrees they had not been met. So now there is an obligation that the government remove one ton from South Carolina, and so that's really what we're focused on, only that. And they say they can do it. They're now telling the court they can do it. The board knows what they'll say in December, but right now they're saying they can do it. And if they can do it, then I think this court should just affirm the injunction, and if it turns out we get within six months of the beginning of next year, i.e., say this summer, this coming summer, and they can't do it, you know, you can always go back to a court and ask for an injunction. Do you think in entering the injunction, despite the language of the APA, do you think the court has still some discretion in given circumstances to deny it? I can't find it. Every case I've read that actually deals with this specific point, and there aren't very many of them, Forest Guardians perhaps being the leading one. Although NRDC, the training, I think also says when Congress sets a deadline, I mean an actual calendar date, that's agency action withheld, which, by the way, hasn't been concessive that this is agency action withheld. No, I get that far. That condition's been satisfied. The question is now the remedy. The APA says that the relief shall be granted. I'm sorry, I can't remember which case it was, but there's one case that says when Congress has spoken, Congress has the power to cabin the discretion of district courts as far as dates go and as far as mandatory commands of Congress go, and I would say this is one of those cases. But it's kind of, we had one of those cases here one time involving a COLAC where they were supposed to do something by a certain date that said shall, and ended up in the Supreme Court, and they indicated that shall meant may in the context of that. There's not much wiggle room in this one, though, I wouldn't think, and the board knows it's been extended three or four times, and each time a fixed deadline. As Judge Wynn pointed out, it doesn't look like there was an awful lot of advanced planning going on with this until 2016. Is the most recent progress report the one of June 13th? Correct. They filed it, and then we called attention to it. That's very positive from what they're doing. Sure. That's why I say just affirm it and let them come back. Reasonably confident it'll meet the court's deadline. Right. If they affirm this order, and if it turns out six months or a year from now, they're still within the two-year deadline, they can't make it. They can come back and make another showing to the district court. I don't think anything in an affirmance by this court would affect their ability to come back later if subsequent events proved it impossible. I've been to this court three or four times on one case involving prison overcrowding in the 80s, Plyler v. Moore and Plyler v. Evatt, where we couldn't do it. That's before we were born. Well, I think it was my grandfather who was here. Evatt and I have been around here long enough that we were actually on another case involving this stuff and involved in South Carolina like 15 or 16 years ago, where the state was trying to keep the stuff out of the South Carolina. I think if I was coming on a boat from Russia. You all didn't want it. I was on the case where the boat was floating around out in the South Carolina and it was floating around out there for a while. Well, this is old alumni week. Let me ask you a question regarding, at least in terms of how we are looking at it from an equitable perspective. There seems to be some disagreement to the extent whether equitable relief is available on the 706 one, but is there any disagreement by the parties that at least as to the scope of the remedial order, the trial judge had discretion and that that discretion in and of itself could possibly entertain the possibility that noncompliance is okay? I didn't get the last part about noncompliance. In other words, the fact that the trial judge, while she may have been compelled under your view to enter the injunction, she nonetheless had discretion with regard to the remedial order, and that discretion was fairly broad, and it could encompass a consideration of the impossibility and other considerations. I would say that yes. She looked to Congress and adopted Congress' two-year deadline, but if they'd made a sufficient showing at that time that it was impossible to get it done within two years because of things that have happened perhaps since Congress first came out with that, I would not say that she was absolutely positively bound to do a two-year award. She could have done one longer if a sufficient showing had been made. It's a good question, though, on the theoretical aspect of it because if your position is correct that she has to enter some relief, doesn't she have broad discretion in the scope of the relief such that it could in effect amount to a denial? In other words, she could have said, okay, get a ton out of here within 20 years. I don't think that would stand up. Well, it may not. It may be abuse, but she's ordering. She's entering an injunction. She says get it out in 20 years. That carries out Congress' intent. I find that there are all kinds of circumstances that have to be considered. They have to discuss this. They have to have their meetings. They have to go to the states. The senators have to agree. There have to be statutes enacted, buildings corrected, and she may be wrong, but she could do that, couldn't she? I think that would be abuse all the way simply because— So you'd be up here appealing then? I'd be up here appealing. Sure, sure. But you'd be appealing on abuse of discretion, not on the mandatory aspect of the relief. I think we would say that, of course, it's hypothetical, that she did have a duty to compel agency action wrongfully withheld, and that would have to bear some resemblance to what Congress had done. I mean, if you can tweak it, if some showing of impossibility or very serious difficulty had been made, and two years wasn't a very good number anymore, maybe extend it a little bit, but not just indefinitely, just not open-ended. But, you know, at this point, it doesn't seem like you need to even go there. It seems like you could simply embrace that possibility. It says, yes, she was compelled to enter an injunction, but she did have discretion, which encompasses all of these equitable considerations that the department wants to happen, and then argue essentially, well, she did. She had discretion. She weighed it back and forth. She looked at the two-year, and she chose that, and that was not an abuse. That's exactly what I think I did. Well, I was going to say— Well, you just admitted it. But my point is, why would you say, no, we would back up the argument that she didn't have abuse of discretion regarding the scope of it? Well, I would say if she came up with some sort of four-year, five-year, six, seven, eight-year— But you don't have to go to that hypothetical in this case. That's what I'm saying. I won't go to that. I wouldn't do that. I wouldn't draw any agreement with that hypothetical. I don't have anything else. All right. Thank you, Mr. Whittington. Mr. Tenney, you have five minutes. Tell us we probably have got everything wrong. I want you to understand, and I've already said this, I very much appreciate the difficulties in the task that the agency has and the sensitivity with what we're dealing with when we're dealing with plutonium and plants. I think my efforts really are to try to keep it as narrow as possible and focus on the duty to remove plutonium, one ton of plutonium, from South Carolina. Thank you, Your Honor. The main point I want to make on rebuttal is just that, as colloquially with opposing counsel illustrated, much of the discussion that occurred during my opening argument was discussion about how to properly balance the fact that Congress had issued this mandatory deadline, the difficulties that the agency might encounter, the safety harms that I've identified. Our core submission in this case is that that balancing is something that should have been done by the district court in the first instance and that the district court was operating under a mistaken impression about the scope of her discretion. Because she was operating under that mistaken impression, her injunction was infected by an error of law. For that reason, even if this court thinks that it might, if it were empowered to make these decisions in the first instance, might ultimately have issued the same injunction that the district court issued, that's not really the question. The question is whether the order that the district court issued was infected by an error of law, and we submit that it was. If she had been in the Tenth Circuit, would she have been in error of saying that? She would have, yes, Your Honor, for the reasons that came up toward the end of opposing counsel's argument. Even in the Tenth Circuit, even if they say you have to issue some injunction, there's still discretion to determine exactly the nature of the injunction, and in doing so you have to consider You mean the scope of the remedy? Well, in Forest Guardians itself, the Tenth Circuit said I'm going to send this back to the district court because the district court has to consider what's involved in accomplishing what's supposed to be accomplished. But the question is if the court feels compelled to end an injunction and then thereby feels further that, well, now I have to fashion a remedy, and the scope of the remedy is within her discretion, can you not achieve the same goal that you wish to achieve by saying, well, she has discretion in the first instance? I think substantially you could. I mean, we disagree with Forest Guardians in the first place, so I don't think there's an inherent contradiction in saying that. But it's certainly true that, I mean, if she was in the Tenth Circuit and she said, well, the problem is if I take two years, they're going to have to do it in this way that is wildly inconsistent with agency policy and with policies that Congress seems to be amenable to because Congress is encouraging dilute and dispose and would expose people to unnecessary risk because you would transfer it out to Nevada, and then when you were finally ready to get rid of it, you'd have to transfer it all the way back to South Carolina. And she could have said, okay, well, asking them to do it in two years would require them to take these steps that aren't appropriate in the exercise of equitable discretion, so instead I'm going to give them five years. And she could have done that, and then maybe they would be out there arguing that was an abuse of discretion, and we would be saying it was fine. Or maybe if she had exercised all that and she had all the record before her, including the more recent evidence, she would say, no, I stick by my original view, but I'm actually exercising discretion this time because the Fourth Circuit has informed me that I have discretion to exercise. Do you think substantively the two years, let's say she gave all the reasons that you did all, she laid out all her thinking, and she then arrived at two years. Would two years in and of itself be an abuse of discretion? I mean, I suspect we might argue that it would, but obviously we would have to look at the reasoning that she engaged in and figure out whether she had a legitimate reason for doing that. You know, we would strenuously argue that it's inappropriate, I mean, because she recognized that she's not supposed to tell them how to do it. And if you do a timeframe that constrains the way that they do it and makes them do it in this way, that clearly from the standpoint of safety and plutonium policy is suboptimal, that's a big deal. And I think that it would be appropriate for her. You know, she was reacting a little bit to the arguments that you made, basically, which is focusing almost entirely on this dilute and dispose and all the activities that are required and that she didn't consider those. And, of course, those weren't an issue at all. If I were the district judge sitting with the record that I see before us now, I would probably rule you out of order in talking about those. Those are policy decisions that you can carry on. The real question is just the simple task of removal. And that was what the issue was. The state of South Carolina is trying to enforce a statute that says remove, not process. And the question is, what did remove mean? And she picked two years. And you say it could or could not be an abuse of discretion. She did exercise some discretion on that, although she, you say she, I don't think she felt mandated by the two years picked by Congress. I think she decided as a matter of discretion that it was appropriate because Congress had done it that way. But I understand your point, but I just want to clarify that. I don't think the whole discussion about the proper disposal of plutonium and the alternatives of dilute and dispose are at issue on this. I think the statute provided the removal as an alternative to other forms of disposal. The statute really was focusing on the MOX plant, obviously. And the MOX plant is, what are we talking about, 2049 now? Right, yeah. And you'll obviously be hearing more about that shortly. But in terms of, to respond directly, I think your question suggested that the question of whether just removing it as opposed to doing dilute and dispose was before the district court. Well, it was before, but I think your arguments to the court kept focusing on the dilute and dispose. They did in your brief on appeal. And I kept wondering, I understand that process, but that doesn't have anything to do with the removal from the state of plutonium. What it does, it says, okay, we get rid of it in another way. Well, I would go back to the Gunther Declaration. And if you go to page 854, there's a section of the declaration which is entitled, Reasons why DOE's decision to continue downblending, which is a synonym for dilute and dispose, for disposal at WIPP is a better option than seeking to transfer one metric ton of plutonium to a facility. That's exactly my point. That's exactly my point. That is not an issue that the court had a legitimate say in. In other words, it's the agency's decision that dilution is better than removal. That's legitimate. But Congress said remove one ton. There's a lot of other tons. How many tons do you have there, 37 tons? I mean, 34 tons. Actually, the exact number of tons is classified. Oh, excuse me. I guess the point is that dilute and dispose is a mechanism of removal. You downblend it and then you ship it out in diluted form. And just to finish the sentence, it's better than seeking to transfer one metric ton to a facility other than WIPP. And there's a section and there's four pages of the declaration on this topic. If you don't like the statute, you've got to get Congress to fix it. We can't fix it for you. You don't have the right to ignore it. Well, Your Honor, but it's not ignoring the statute because it is. That's exactly what you're saying. No, what I'm saying is how are we going to get it out of there? And as this court previously recognized, you can repackage it, you would have to repackage it, and you can transport it in undiluted form to another facility. That's the only thing that was ordered. Package it up and remove it. But then the question is, I mean, the statute doesn't say you have to repackage it. No, it just says remove it. Right. But so my point is just there's different ways to remove it. You can dilute it and then remove it. You can repackage it in its current form and then remove it. These are all ways of removing it. Your Honor just told you to remove it. She didn't tell you how to do it, right? You just said remove it. Right. But you say in your report here to her in June, we're reasonably confident that we'll be able to meet the court's deadline. Yes, but my point is just she said remove it. She didn't tell us how to do it, but she gave us a timeframe. In the context of all that, it doesn't seem very complicated to me. Well, she gave us a timeframe under which you could only remove it in one way. But you're meeting the deadline. The department is reasonably confident it will be able to meet the court's deadline. Is the next report going to say go 180 degrees from that? It's going to change the position? Your Honor, I hope not. Obviously, we're still in the process of trying to do that. Right. Then that would be something to take up with the district court, not us. Let me give a hypothetical, Your Honor. Suppose that we could do it exactly the way that we're doing it in two years. Or we could do it with dilute and dispose, which would finally dispose of this material, have it transported in a safer way, and ensure that once the dilute and dispose is done, nobody's ever going to have to touch this plutonium again, so there's not going to be any more health consequences. And suppose we could do that in two and a half years. And the court issued an order saying two years. We would say that's an abuse of discretion, because even though it says remove. You go back to the court and say, we can't do it in two years. It's impossible, Your Honor. We need another six months. No, we would say. We've got to have two and a half years. But your dilution proposal, what did you say was going to take, 2025? Yeah, no, I recognize the times are different. I know. So if you came back with your hypothetical, which we don't have before us, she could insist, well, the statute says remove. It didn't say dilute and process it and then remove it. She could say that, and then we'd have to decide whether in saying that, that was abuse of discretion when only another six months you could go through this process. But the real facts of this case are, I think you said something like 2025 under your process. Right, initially, and we're working to see if we can expedite that. But I guess just to return to the point that I started my rebuttal with, and, again, I apologize, I'm way over my time. Yeah, I'm going to give you a few more seconds. Whether it's two versus two and a half or two versus seven or whatever it is, that's a decision that the district court should make, recognizing that she has discretion to make a determination, and then it should be reviewed by this court for abuse of discretion. And what happened here instead was that she made a decision thinking her discretion was constrained, and for that reason. I think she thought it was constrained in some respects along the lines that Judge Wynn explored. That is, she thought she had to enter an injunction, but I think she recognized the scope of the injunction was within her discretion. That's the way I read it. I may be wrong. I'll look back at her order again. Right, but these are not unserious arguments, I understand. And it's clear that she didn't take account of, I mean she certainly didn't expressly take account of the practical difficulties. She just said, come back to me later if it's impossible. And we submit that that also was something that she should have done. She'll listen to you. You're persuasive. Okay, we'll wrap this one up and come down and greet counsel. Thank you.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.